JohNstoN, Ch.
The Court of Errors having decided that the instrument executed by Thomas G. Jaggers, on the 12th of April, 1820, may, if duly delivered, operate as a deed, has directed a further inquiry as to its delivery. I feel no difficulty in adjudicating that point, having no interest in that question.
The only inquiry now, is whether the instrument was delivered; and I think the evidence before me (which will appear from my notes,) is sufficient to establish that it was.
A question somewhat preliminary was raised, whether a delivery of the property was not essential to the operation of the deed. If I had any doubt, on this point, it seems to be resolved in the judgment of the Court of Errors. But I have none.
I take it that personal property can, in no case, pass without a delivery. But this does not mean that there must, in all cases, be an actual tradition of the property. Whenever an effectual means of controlling such property is conferred by its owner on another person, that is a valid delivery of the property.
In some of the cases, (Fitts v. Mangum is, perhaps, one of them.) it has been held, that if a transfer be attempted by parol, and the owner interpolate conditions, or uses expressions signifying that he does not intend a present possession of the property to pass, the transfer of property is ineffectual. This is upon the ground, that parol carries no proprietary *380 right of control, without a delivery ; and where an intention t0 ¿ehver js negatived by the owner, the right of property ‘ does not pass, but remains in him. In such a .pase, the con-. troj ^ pr0perty can he transferred only by its delivery. It is different, I apprehend, .where writing is the medium of conveyance. The delivery of a deed, imparting a right of property, is a legal delivery of the property itself. It has been sometimes called a symbolical delivery of it; but this is not my view. The deed does not operate on the property in virtue of its being a symbol of it; but because it carries on its face an acknowledged right in the grantee to control it. I do not mean a present right to enjoy it; but a present right to dispose of it according to the grantee’s interest in it. That is universally a delivery of personalty, which confers the means of coming at the possession of it. A symbolical delivery of one thing in the name of another is no delivery of the latter. The argument of Lord Chancellor Hardwicke, in Ward v. Turner, is conclusive upon this point. But if the 1’key be delivered of a desk, in which a paper or a jewel is contained, the paper or jewel is thereby delivered; because he who has the key has the dominion of it. A deed stands upon analogous grounds, and whenever the deed is effectually executed and delivered, it draws to the grantee the thing conveyed in it, according to its terms.
2 Ves. Sr. 43.
The true question in the case, is that which the Court of Errors sent down to this Court. Was the deed delivered? The testimony (to be found on my notes) does not materially differ from that which was offered before Chancellor Caldwell.
The delivery is proved by John P. Roden, one of the attesting witnesses, under a commission issuing to Alabama, where he now resides. The other witness, Caleb Davis, is dead.
On the other hand, Mr. Rosborough, the Registrar of Mesne Conveyances, says that when this deed, with four others, co-temporaneously executed, was produced for registration, (which appears to have been the 6th of Sept. 1820,) he drew an affidavit on one of the deeds, in the usual form, to be sworn to by Roden, who was present; but Rodon declined to swear to it. The affidavit, as drawn at first, was to the effect, that the affiant saw the deed signed, sealed and delivered. Roden objected, that he could not swear to the delivery. Upon which Mr. Rosborough struck out the word “delivered,” and substituted the word “ acknowledged.” Which of the deeds it was to which this objection was specifically made, the witness does not remember. But whichever of them it was, it appears that it was the first that was produced: for Mr. Rosborough says, that upon Roden’s objection being made, he inferred that it applied equally to all the deeds, and *381 accordingly adopted the same form of affidavit for the remaining deeds. t
In addition to this testimony of Mr. Rosborough, Nancy Ward was produced and examined for the defendant. Her testimony, with that of the other witnesses, will appear on my notes. I cannot place the least reliance upon her evidence. She was utterly discredited ; and she discredited herself by her manner, her inconsistencies, and the inherent improbability of some of the facts to which she most confidently deposed. Indeed, she was obliged to admit, “that ever since the affair of the forged note, many persons had undertaken to undervalue her character.”
Discarding this witness, the issue of fact depends mainly upon the testimony of Roden and Rosborough. There is no doubt, whatever, of the veracity of these witnesses.
Every witness on both sides, including Mr. Rosborough himself, attributes the highest character to Roden; and from a very considerable personal acquaintance* with him, I am persuaded he is justly entitled to it.
I am still better acquainted with Mr. Rosborough, whom I have known from my childhood; and I know him to be incapable of the least intentional perversion of truth. If there is any conflict in the testimony of these witnesses, it certainly results from infirmity of memory; and the question in that case would be, which of them possesses the clearer recollection ; which of them is most likely to have the more accurate recollection, and which of them is best borne out in his impressions by collateral circumstances, and facts testified to by other witnesses.
But there is no conflict between the two, unless Roden, in the Registrar’s Office, professed to be unacquainted with the delivery of this particular deed, or in terms extended his objection to the whole batch of deeds then produced. Mr. Ros-borough does not recollect that he did either. He speaks with much hesitation. He does not remember that this was the deed which drew forth Roden’s objection ; and although now satisfied in his mind that Roden intended his specific objection to apply to all the deeds, he cannot remember that he stated it in words of that extensive import. The evidence is substantially this. One of the deeds was produced, and Ro-den refused to prove its delivery.
Mr. Rosborough, seeing that all of them were cotempora-neous and imported to have been executed before the same attesting witnesses, inferred that they all stood upon the same footing; and that if Roden was unable or unwilling to prove the delivery of one, he must be equally unable and unwilling to prove the delivery of the others. Having, this impression of-the operation (not the meaning) of Roden’s objection, he applied it to the whole of the deeds, by a silent change of the *382 form of the following affidavits. Nothing appears to have said to Roden, calculated to apprize him of Rosborough’s opinion, or to draw from him any disclaimer of the correctness of that opinion. How then can it be said that Roden, on that occasion, disputed the delivery of any other deed than the one first produced 1 Or that this is that deed ? Or that his present recollection of the delivery of the deed before us, is at variance with his statements in the Registrar’s Office ?
Mr. Rosborough’s testimony not only fell very far short of convicting Roden of inconsistency, but to the extent he did go, he spoke with much distrust of his own memory. On several collateral points, relating to the transaction in his office, upon which his memory was tried, it was found to have failed— and no wonder. There was nothing so important in the matter, as to have made an indelible impression on him at the time.
He is now a very old man ; and this was but one of the thousands of probates made before him in a long official career, now extending to 48 or 49 years. It has been argued, however, that Mr. Rosborough’s memory was fixed by an occurrence which took place sometime afterwards. This argument proceeds upon a mere confusion of ideas.
Mr. Rosborough heard a rumor sometime after the occurrence in his office, that the deeds, or some of them, had been surreptitiously obtained. This, by its coincidence with the inference he had drawn from Roden’s objecting to a particular deed, confirmed him in that inference, and perpetuated the recollection of it. He was now sure that Roden had good reason for declining to prove the particular deed to which he objected, and not doubting that all the deeds stood upon the same footing, he was confirmed in the impression that he could not have proved the delivery of any of them.
On the other hand, there are strong circumstances in favor of Roden’s testimony. He says he saw the deed in question, in this case, delivered to Elizabeth Jaggers, the grantee; and so lively is his recollection of the facts, that in his testimony he deposes to the provisions of the instrument, the property conveyed, and the words in which the delivery was couched. His relation to the whole transaction renders it probable that he should have retained an accurate remembrance of it.— He drew the paper, and was one of the attesting witnesses. He lived then, and for nearly 20 years afterwards, in the immediate neighborhood, where the transaction was often referred to by the parties and others. If his attention had been drawn to it, he might possibly have shown that one of the deeds was not delivered, and that that was the one to which he objected: for one of them (not this one) was subsequently delivered up by the party interested in it, and the ground of redelivery may have been that it was surreptitiously obtained. This would have reconciled the whole of the testimony.
3 Phillps, notes 1261-4, and note 888.
Mr. Roden is borne out, also, by other circumstances. His statements, when he must have had a full recollectin of facts, were consistent with his present memory of them. In a conversation with Anderson, he told him, many years ago, that Thomas G. Jaggers (the grantor) had offered to purchase his lands, and to pay for them in the deeded negroes ; and that he had declined the offer ; adding, that if he took the negroes, he must necessarily run them off, for they would belong to others at Thomas’s death. Anderson says Roden often told him the deeds were correctly executed.
The circumstances testified by Phillips, go to show that whatever objections Thomas may have had to the claims of his sisters, the non-delivery of the deeds was not one of them. And finally, the probability of the delivery of the deeds, in general, is strengthened by the fact, that several of the other grantees were shown to have been in possession of their deeds, and no credible proof was produced (for, as I have said, I cannot rely on Nancy Ward) that any of them got them unfairly.
But suppose I am mistaken, both as to the drift and the weight of the testimony I have been considering. Suppose Mr. Rosborough had said, and said it with confidence in his memory, that Roden declared expressly that he did not see this specific deed delivered. And suppose that Roden, when examined as to its delivery, had forgotten it. Or suppose, which is certainly strong enough, that on his examination, he had proved that he witnessed all the formalities of executing the deed, except its delivery, and that it was not delivered at that time, but, on the contrary, retained by the grantor. Would it follow from all this, that a post delivery might not be inferred from the subsequent possession of the deed by the party interested in it? It certainly would be inferred at this distance of time, unless the possession was shown to have arisen in fraud. It may be assumed, in general, that whenever a deed, duly signed and sealed, is in the possession of the party to be benefitted by it, he obtained the possession by formal delivery, unless the contrary is made to appear; especially where the evidence of delivery must, from the nature of the case, be obscure; as where the deed is of ancient date, or the witnesses are dead, or out of the jurisdiction. In this case, we have the fact from the defendant’s own witness, Mr. Rosborough, that the deed under which the plaintiff claims, was in her possession on the 6th of September, 1820, (five months after its execution.) Now, if we had no other testimony than that on which the defendant relies, to wit: that the deed was, at its date, signed, sealed, and acknowledged, but not then delivered, are we thence to conclude against the delivery, without considering whether a post delivery may not be inferred after such a lapse of time, *384 from the fact of possession alone ? Few deeds of 28 years t old, could be better proved than this one.
To sum up this view, in connexion with others already taken: A deed is effectually delivered, whenever the circumstances warrant the presumption, that the grantor has divested himself of his control over the instrument; as if he place it in the hands of the grantee, or in the hands of a third person for the grantee’s benefit; or if he transfer to them the means of coming at the possession, such as the key of a desk, in which the deed is locked up. All these are but different methods of passing the control of the instrument from himself to another ; and whenever, and by whatever means this is done, there is a delivery; which, in principle, and in all cases, is neither more nor less, than the transfer of control over the thing intended to be delivered. The fact of being in possession of the deed, in this case, is evidence that the control which the possession- imports, was conferred by the grantor, unless the contrary were shown. The delivery and control of the deed being thus established, the deed is perfected, and a deed duly perfected carries, the right to control the property mentioned in it; which right of control operates as a delivery of the property itself.
It is ordered and decreed, that the defendant do deliver up to the plaintiff, the slaves described in the bill, as passing under the deed of Thomas G. Jaggers, to the plaintiff, with their issue born after the date of said deed; and that he come to an account with her, before the Commissioner, for the profits of their labor since the death of said Thomas G. Jaggers.